**Daniel Snyder**, Oregon State Bar #78385
Dansnyder@qwest.net
**Sara Thistlethwaite**, Oregon State Bar #04132
Sarathistle@qwest.net
LAW OFFICES OF DANIEL SNYDER
1000 SW. Broadway, Suite 2400
Portland, Oregon 97205
Telephone: (503) 241-3617
Facsimile: (503) 241-2249

FILED '05 SEP 29 10:24USDC-ORP

      Of Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| SANDA NEDELCU,<br><br>        Plaintiff,<br><br>        v.<br><br>CLACKAMAS COMMUNITY COLLEGE FOUNDATION, a non-profit public benefit, qualified to do business in Oregon, and DIAN CONNETT,<br><br>        Defendants. | Case No. CV '05 1512 KI<br><br>**COMPLAINT**<br><br>(Title VII gender, sex, and national origin, 42 U.S.C. §1983, Pendant State Claims)<br><br>**JURY TRIAL DEMANDED** |

## PRELIMINARY STATEMENT

    1.    This action is for damages to redress deprivation of rights under Title VII

national origin, sex and gender discrimination, 42 U.S.C. §2000e *et seq.*; 42 U.S.C. §1983; and

related pendant state claims under the Unlawful Discrimination and Retaliation based on

national origin, sex and gender, ORS 659A.030; Whistleblower law ORS 659A.230.

\\\

Page 1 - COMPLAINT

## JURISDICTION

2.      The jurisdiction of the Court over this controversy is invoked pursuant to the

provisions of 28 U.S.C. §1331, 29 U.S.C. §2617, 28 U.S.C. §1343. This court has jurisdiction

over the related pendent State claims under Rule 18 of the Federal Rules of Civil Procedure.

3.      All preconditions to jurisdiction under section 706 of Title VII, 42 U.S.C.

§2000e-5(f)(3) have been satisfied.

(A)     On or about May 9, 2005, the plaintiff filed a complaint of discrimination and

retaliation with the Bureau of Labor and Industries ("BOLI"), Case No. EE-EM-SX-050509-

10679 and concurrently with the Equal Employment Opportunity Commission ("EEOC"),

Case No. 380-2004-03877; said filing was within 300 days of the alleged employment

discrimination against her.

(B)     BOLI issued a right-to-sue letter to the plaintiff on or about July 5, 2005.

Plaintiff filed this complaint within ninety days of plaintiff receiving this right-to-sue letter

from BOLI.

(C)     The EEOC issued a right-to-sue letter to the plaintiff on or about August 14,

2005. Plaintiff filed this complaint within ninety days of plaintiff receiving this right-to-sue

letter from the EEOC.

4.      On August 28, 2003, the plaintiff provided defendant CCC with a tort claim

notice for discrimination. On April 22, 2005 and again on May 3, 2005, the plaintiff sent

additional or supplemental tort claim notices to defendant CCC.

5.      Venue is in the District of Oregon pursuant to 28 U.S.C. §1391(b) because the

claim arose in this Judicial District.

\\\

Page 2 - COMPLAINT

## PARTIES

6.      The plaintiff Sanda Nedelcu ("Nedelcu") is a native of Romania and is a naturalized citizen of the United States.

7.      At all relevant times, the plaintiff worked for defendant Clackamas Community College Foundation (hereinafter "defendant CCC") in Oregon as a professor. Defendant CCC is a non-profit public benefit qualified to do business in Oregon.

8.      Defendant Dian Connett ("Connett") is at all relevant times the Dean of Instructional Services of CCC.

## STATEMENT OF FACTS

9.      In 2000, the plaintiff began her employment with defendant CCC under an employment contract, said contract to be renewed annually. Defendant CCC hired the plaintiff to work as a professor and program developer in its Microelectronic Program.

10.     At all relevant times, defendant CCC employed Scott Giltz ("Glitz"), Dian Connett ("Connett"), Karen Stubblefield ("Stubblefield"), Sandra Medley ("Medley"), Wayne Sellevaag (Sellevaag"), Michael Mattsen ("Mattsen") and Glenn Ferris ("Ferris"). At all times relevant, the conduct and actions of Glitz, Connett, Stubblefield, Medley, Sellevaag, Mattsen and Ferris as alleged herein were within the scope and course of their employment with defendant CCC.

11.     During the Fall of 2000, the plaintiff was sexually harassed by her supervisor Giltz, who then was the head of defendant CCC's Manufacturing Department. The sexual harassment continued for the next several months. This harassment included inappropriate touching; false pretenses to spend time with the plaintiff; inappropriate topics of conversation including Giltz's relationship with his wife; undue attention by Glitz toward the plaintiff, such

Page 3 - COMPLAINT

as starring at the plaintiff; Giltz tracking down the plaintiff to her post-labor hospital room

which was private information, and told her, "hey stranger, I want you back right now."

12.    After the Fall of 2000, the plaintiff moved to the OIT building to start her

teaching assignments. That building is located away from Giltz' work location.

13.    On or about December 13, 2002, the plaintiff was teaching a full teaching load,

in addition to her management duties of two programs. The plaintiff asked Dian Connett, Dean

of CCC, adjusting her teaching load to allow time for her management duties. Even after this

request, defendant CCC continued to assign the plaintiff a full class load, while other male,

full-time instructors had 65% to 70% class loads.

14.    During this December 13, 2002 meeting, the plaintiff reported to Connett

harassment and discrimination issues at work, including sexual harassment by Glitz. The

plaintiff also reported that Glitz's secretary, Medley, mocked her accent and referred to the

plaintiff as "that Romanian" rather than the plaintiff. Connett responded that the plaintiff

should get along with Medley. Regarding Giltz, Connett said to the plaintiff that, "if you are so

unhappy, I will buy out your contract and you can quit your job now."

15.    In approximately January 2003, Giltz was promoted to the position of Associate

Dean of the Industrial Division.

16.    On or about March 5, 2003, the plaintiff received her annual evaluation. The

2003 evaluation, unlike the previous evaluations, contained negative comments based on

alleged incidents which were not true. Giltz recommended in writing to Ferris that plaintiff get

a negative evaluation. Ferris rated the plaintiff's job performance as "unsatisfactory."

17.    On or about May 19, 2003, the plaintiff submitted her written response to the

2003 evaluation, disputing and disproving those negative allegations. Defendant CCC failed to

Page 4 - COMPLAINT

rescind the unsatisfactory rating.

18.     On or about June 13, 2003, Ferris showed the plaintiff a second 2003 evaluation

(Spring evaluation) in which defendant CCC also rated the plaintiff's performance as

satisfactory. Connett later formally presented the second 2003 evaluation to the plaintiff. When

Connett presented the second 2003 evaluation, the evaluation had been further revised and

implied that the plaintiff had acknowledged an existing problem, even though the plaintiff had

already stated that she disagreed with the implication.

19.     In the Fall of 2004, the plaintiff was notified that she would be moved back

into Barlow Hall effective Spring 2004. Defendant CCC stated the reason for this move was

because of mold in another building, CCC Harmony, a building that the plaintiff did not teach

in. The plaintiff's classroom in OIT did not have any mold in it. The plaintiff asked the reason

for the move because her classroom did not have a mold problem. Defendant CCC moved the

electronics lab to Barlow Hall. Although the plaintiff brought up her concerns with defendant

CCC about the move, defendant CCC ignored her and she was made to move. Barlow Hall was

where Giltz's office was still located. Barlow Hall did not have space fitted to accommodate an

electronics lab or a teaching classroom because it was designed as a machine shop. This move

raised safety issues because the lab would remain accessible to anyone even when there was no

instructor to supervise, which could cause injury to the students, damage to equipment, and

loss of equipment.

20.     On March 5, 2004, the plaintiff was issued a 2004 evaluation by defendant

CCC. This evaluation was written by Giltz. Although the 2004 evaluation was positive, there

were still "areas of concern." Giltz claimed that the plaintiff caused a loss of productivity by

looking into the move out of the OIT building to Barlow Hall. Mr. Giltz stated that the plaintiff

Page 5 - COMPLAINT

would not have another good evaluation unless she went to Employees Assistance Program (EAP) for counseling. Mr. Giltz was the only other person identified as having interpersonal problems with the plaintiff, but he was not asked to go to EAP. Attendance at EAP was a recommendation and not mandatory.

21.    During the Spring 2004, after the plaintiff moved back to Barlow Hall, Giltz told the plaintiff that she should move from her assigned office to an office close to his. In June 2004 and in August 2004, the plaintiff complained to defendant CCC about Giltz telling her to move her office to be next to his office.

22.    In June 2004, the plaintiff and defendant CCC attended an arbitration regarding the 2003 evaluation. During this arbitration, the plaintiff's complaints of harassment and discrimination came up as well.

23.    In approximately August 2004, the defendant CCC's Manufacturing Department and defendant CCC's Human Resources separately contacted the plaintiff to let her know that she could move offices if she wanted to. The plaintiff responded to Human Resources that their suggestion was an attempt to justify Mr. Giltz's inappropriate suggestion. The plaintiff also notified Human Resources that Giltz had been staring at her and smiling at her.

24.    On or about November 22, 2004, Connett asked to meet with the plaintiff. At this meeting, Connett stated that it would be considered unprofessional behavior for the plaintiff to bring up her complaints of harassment and discrimination. Connett had this meeting with the plaintiff just before a well-publicized Civil Rights Review of CCC which was to take place within the next few days, that would help the accreditation of CCC. Because unprofessional behavior is one of the grounds for dismissal in the plaintiff's contract, and she was afraid to be dismissed, she decided not to participate in the Civil Rights Review.

Page 6 - COMPLAINT

25.    At the same November 2004 meeting, Connett again brought up plaintiff going to EAP. The plaintiff told Connett that if she wanted the plaintiff to attend EAP, then the plaintiff wanted Giltz to attend EAP with her so that they could effectively address their interpersonal issues with a neutral third party. Connett stated that only the plaintiff needed to go to EAP.

26.    In November or December 2004, Sellevaag stated that he found a door open on a Friday, and that one of the oscilloscope was missing. Sellevaag notified the plaintiff, and the plaintiff sent an email to all faculty regarding this missing oscilloscope. Mattsen confronted the plaintiff about having used that classroom on Friday, and implied that the loss of the oscilloscope was her fault. Mattsen then threatened to report the plaintiff to the police. The plaintiff was not teaching that Friday, and she reminded Mattsen that Sellevaag had borrowed an oscilloscope a year before and he never reported it returned. Suddenly, Mattsen then located the oscilloscope in a different classroom.

27.    On or about March 11, 2005, Giltz wrote and issued to the plaintiff her 2005 evaluation in which he rated the plaintiff as unsatisfactory. Giltz recommended that the plaintiff not be moved to the next salary step movement. In this evaluation, no conflicts regarding the plaintiff were reported by the members of the department or by any students. This evaluation stated that the plaintiff's decision to decline to attend EAP was an insubordinate negative issue. Stubblefield, defendant CCC's Human Resources Director, told the plaintiff that she had thirty days to respond to the evaluation before a decision would be made on a finalized evaluation.

28.    On or about March 12, 2005, Stubblefield wrote the plaintiff a letter that stated that her contract would not be renewed.

Page 7 - COMPLAINT

29.     On or about March 14, 2005, the plaintiff received a dismissal notice in the mail. As of the time or dates that the defendant CCC decided not to renew the plaintiff's contract and dismissed her, the plaintiff was still within the thirty-day period given to her by defendant CCC to respond to the 2005 evaluation and the plaintiff had not had the opportunity to respond to the 2005 evaluation.

30.     On or about March 15, 2005, Connett held a meeting with the plaintiff, and Stubblefield. Connett stated that the college decided not to renew the plaintiff's contract based on the 2003 evaluation. The plaintiff stated that the 2003 evaluation was resolved through a second 2003 evaluation (Spring 2003) evaluation which was positive, and the department input for the following yearly evaluations 2004 and 2005 did not report or allege any conflicts. The plaintiff asked Connett whose decision it was not to renew the contract, and she said that the college decided. When the plaintiff asked, who is the "college," Connett stated, "I am the college."

31.     As a direct and proximate consequence of defendant CCC's unlawful and discriminatory employment policies and practices and retaliation, the plaintiff suffered emotional distress, interference with normal and usual activities, a loss of income, including, but not limited to, reinstatement, past and future wages, benefits, expenses, suffering, interference with her normal and usual activities, compensatory damages and punitive damages, all to be specified at trial.

## STATEMENT OF CLAIMS

## FIRST CLAIM FOR RELIEF

(Title VII - Gender Discrimination)

Plaintiff realleges paragraphs one through thirty-one as if fully restated herein and

Page 8 - COMPLAINT

further allege:

32.     The plaintiff was subjected to a hostile work environment, retaliation and gender-based discrimination with respect to the terms and conditions of employment because the plaintiff made gender-based complaints against defendant CCC, and defendant CCC changed the terms and conditions of employment based upon plaintiff's complaints of unlawful employment practice.

33.     As a result of the defendant CCC's discrimination against the plaintiff, she suffered emotional harm, emotional pain, suffering, inconvenience and loss of enjoyment of life and is entitled to reinstatement, compensatory damages in the approximate amount of $250,000.00, approximately $27,360 through September 27, 2005 in back pay and benefits, punitive damages, and future pecuniary loss, to be more accurately proven at trial.

34.     The plaintiff also seeks an award of her reasonable attorney fees and costs pursuant to 42 U.S.C. §2000e-5.

## SECOND CLAIM FOR RELIEF

### (Title VII - National Origin)

Plaintiff realleges paragraphs one through thirty-one as if fully restated herein and further allege:

35.     The plaintiff was subjected to a hostile work environment and retaliation based on national origin discrimination with respect to the terms and conditions of employment. The plaintiff made complaints against defendant CCC, and defendant CCC changed the terms and conditions of employment based upon plaintiff's complaints of unlawful employment practice.

36.     As a result of the defendant CCC's discrimination against the plaintiff, she suffered emotional harm, emotional pain, suffering, inconvenience and loss of enjoyment of

Page 9 - COMPLAINT

life and is entitled to reinstatement, compensatory damages in the approximate amount of

$250,000.00, approximately $27,360 through September 27, 2005 in back pay and benefits,

punitive damages, and future pecuniary loss, to be more accurately proven at trial.

37.     The plaintiff also seeks an award of her reasonable attorney fees and costs

pursuant to 42 U.S.C. §2000e-5.

### THIRD CLAIM FOR RELIEF

(ORS Chapter 659A.030 *et seq.* - Oregon Employment Discrimination)

Plaintiff realleges paragraphs one through thirty-one as if fully restated herein, and

further alleges:

38.     Defendant CCC is an "employer" within the meaning of ORS 659A.010(6) and

ORS 659A.030.

39.     The plaintiff was subjected to discrimination based on her national origin and

gender in violation of ORS 659A.030(1).

40.     The plaintiff was subjected to discrimination based on her making and filing

complaints against defendant CCC for unlawful employment practices under Chapter ORS

659A.

41.     The plaintiff seeks equitable relief requiring defendant CCC to cease

enforcement of its discriminatory policies.

42.     As a result of defendant CCC's discrimination against the plaintiff, the plaintiff

suffered loss in back pay in the approximate amount of $10,300 through September 27, 2005,

to be more accurately proven at trial, and is entitled to equitable relief.

43.     The plaintiff is entitled to recover attorney fees and costs pursuant to

ORS 659A.885(1) and ORS 20.107.

Page 10 - COMPLAINT

## FOURTH CLAIM FOR RELIEF

(ORS 659A.230 - Whistleblower)

Plaintiff realleges paragraphs one through thirty-one above as though fully restated herein.

44.     Defendant CCC discriminated and retaliated against the plaintiff because she made good faith complaints of health and safety issues with defendant CCC.

45.     Defendant CCC knew that the plaintiff engaged in these activities described in paragraph 18.

46.     As a result of this discrimination, plaintiff suffered and continued to suffer humiliation, anxiety, distress, and impairment of his personal dignity and right to be free from discrimination or interference with her statutory rights. As a further result of this discrimination, plaintiff suffered losses including lost earnings and benefits, said loss is continuing and shall be determined before trial.

47.     The plaintiff is entitled to back pay, front pay, equitable and injunctive relief, compensatory and punitive damages, and a 9% interest on all lost income.

48.     The plaintiff is entitled to recover attorney fees and costs pursuant to ORS 659A.885(1) and ORS 20.107.

## FIFTH CLAIM FOR RELIEF

(Violation of Civil Rights - 42 U.S.C. §1983)

(Defendant Connett)

Plaintiff realleges paragraphs one through thirty-one as if fully restated herein and further alleges:

49.     Defendant Connett's conduct as alleged herein was under color of state law.

Page 11 - COMPLAINT

LAW OFFICES OF DANIEL SNYDER
1000 S.W. Broadway
Suite 2400
Portland, Oregon 97205
(503) 241-3617 ● Fax (503) 241-2249

50.    Defendant Connett's conduct constituted policy, practice or custom of the State.

51.    In behaving as alleged herein, defendant Connett denied plaintiff equal treatment and equal protection under the law in violation of her rights under the Fourteenth Amendment.

52.    In behaving as alleged herein, defendant Connett denied plaintiff due process under the law in violation of her rights under the Fourteenth Amendment.

53.    Defendant Connett was the final decision-making authority in not renewing the plaintiff's contract.

54.    The plaintiff is entitled to seek redress for the violation of her rights pursuant to 42 U.S.C. §1983.

55.    As a result of defendant Connett's conduct, the plaintiff suffered damages as alleged herein. The plaintiff seeks equitable relief requiring ceasing enforcement of defendant's CCC discriminatory policies and to reinstate the plaintiff. The plaintiff seeks all other monetary relief, including compensatory and punitive relief, as available.

56.    The plaintiff also seeks an award of her reasonable attorney fees and costs pursuant to 42 U.S.C. §1988.

WHEREFORE, the plaintiff prays for judgment as follows against the defendants, and each of them, and jointly and severally, for the sum of $750,000.00 for her compensatory, non-economic damages, approximately $27,360 through September 27, 2005 for her back pay, said loss is continuing on a daily basis and will be amended before trial for her front pay, said amounts to be determined before or at trial, and for her reasonable attorney fees, costs and disbursements, and for such other relief as the Court deems just and equitable.

\\\

LAW OFFICES OF DANIEL SNYDER
1000 S.W. Broadway
Suite 2400
Portland, Oregon 97205
(503) 241-3617 ● Fax (503) 241-2249

DATED this 29th day of September 2005.

LAW OFFICES OF DANIEL SNYDER

SARA THISTLETHWAITE, OSB No. 04132
Telephone : (503) 241-3617
Facsimile: (503) 241-2249
Email: sarathistle@qwest.net
Of Attorneys for Plaintiff

Page 13 - COMPLAINT